# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### MARSHALL DIVISION

| | | |
|---|---|---|
| QUINTON B. CARLILE, KENNETH Q. CARLILE, STEVE B. CARLILE, F. WAYNE McWHORTER, JAMES R. WHATLEY, T.D. McCLENNY, GEORGE E. FITTS, JACK JACKSON, R. WAYNE COLLINS, LEWIS E. BROWN, SR., AMANDA NICKERSON, JAMES R. CAVENDER, WILSON GODFREY, and DELTA CONSTRUCTION COMPANY, INC. | ◊◊◊◊◊◊◊◊◊ | |
| Plaintiffs, | ◊◊ | NO. **2 - 99 C V 0 1 8 7** -*TH/HWM* |
| V. | ◊◊◊ | |
| HIBERNIA CORPORATION and ROBERT H. BOH, STEPHEN A. HANSEL, MARSHA M. GASSAN, RON E. SAMFORD, JR., J. HERBERT BOYDSTUN, E. R. CAMPBELL, RICHARD W. FREEMAN, JR., DICK H. HEARIN, ROBERT T. HOLLEMAN, ELTON R. KING, SIDNEY W. LASSEN, DONALD J. NALTY, RAY B. NESBITT, WILLIAM C. O'MALLEY, JAMES R. PELTIER, ROBERT T. RATCLIFF, JANEE M. TUCKER, VIRGINIA EASON WEINMANN, and ROBERT E. ZETZMANN | ◊◊◊◊◊◊◊◊◊◊◊◊◊◊ | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | ◊◊◊ | |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

9751\532

COME NOW Quinton B. Carlile, Kenneth Q. Carlile, Steve B. Carlile, F. Wayne McWhorter, James R. Whatley, T.D. McClenny, George E. Fitts, Jack Jackson, R. Wayne Collins, Lewis E. Brown, Sr., Amanda Nickerson, James R. Cavender, Wilson Godfrey, and Delta Construction Company, Inc., Plaintiffs, complaining of Hibernia Corporation and Robert H. Boh, Stephen A. Hansel, Marsha M. Gassan, Ron E. Samford, Jr., J. Herbert Boydstun, E. R. Campbell, Richard W. Freeman, Jr., Dick H. Hearin, Robert T. Holleman, Elton R. King, Sidney W. Lassen, Donald J. Nalty, Ray B. Nesbitt, William C. O'Malley, James R. Peltier, Robert T. Ratcliff, Janee M. Tucker, Virginia Eason Weinmann, and Robert E. Zetzmann, Defendants, and for causes of action would show the Court as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this action pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"), 15 U.S.C. §§ 77k and 77l, Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and 15 U.S.C. § 78(j) and Rule 10b-5 (17 C.F.R. 240.10b-5) promulgated thereunder. Plaintiffs also bring pendant claims for Texas common law fraud, Texas statutory fraud under § 27.01 of the Texas Business Commerce Code and under the Texas Securities Act.

2.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims.

3.      Venue is properly found within this district under 28 U.S.C. § 1391(b), Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

Hibernia Corporation ("Hibernia") conducts substantial business in this district, both directly and through its wholly owned subsidiary Hibernia National Bank ("HNB"), and the acts taken by Hibernia in this district, including the dissemination of materially false and misleading information, occurred in substantial part in the district. Additionally, Defendant Nesbitt resides in Marshall, Texas, which is in this district. All Plaintiffs who reside in Marshall, Texas received the materially false and misleading statements and omissions from Defendant Hibernia in Marshall, Texas. Negotiations relating to the actions which form the basis of this lawsuit occurred in substantial part in Marshall, Texas. The stockholders meeting for MarTex Bancshares, Inc. ("MarTex") approving the merger between Hibernia and MarTex occurred in substantial part in Marshall, Texas. Finally, a substantial part of the closing of the merger occurred in Marshall, Texas.

## THE PARTIES

4.    a.    Plaintiff Quinton B. Carlile is a resident of Marshall, Texas, and acquired 578,118 shares of Hibernia common stock in the merger (the "Merger") between Hibernia and MarTex described below.

b.    Plaintiff Kenneth Q. Carlile is a resident of Marshall, Texas, and acquired 587,549 shares of Hibernia common stock in the Merger.

c.    Plaintiff Steve B. Carlile is a resident of Marshall, Texas, and acquired 632,666 shares of Hibernia common stock in the Merger.

d.    Plaintiff F. Wayne McWhorter is a resident of Marshall, Texas, and acquired 309,631 shares of Hibernia common stock in the Merger.

h.    Dick H. Hearin ("Hearin"), Director, may be served at 500 Laurel St. #505, Baton Rouge, LA 70801-1811.

i.    Robert T. Holleman ("Holleman"), Director, may be served at P.O. Box 61540, New Orleans, LA 70161-1540.

j.    Elton R. King ("King"), Director, may be served at P.O. Box 61540, New Orleans, LA 61540.

k.    Sidney W. Lassen ("Lassen"), Director, may be served at P.O. Box 61540, New Orleans, LA 70161-1540.

l.    Donald J. Nalty ("Nalty"), Director, may be served at P.O. Box 61540, New Orleans, LA 70161-1540.

m.    Ray B. Nesbitt ("Nesbitt"), Director, may be served at Shore Road, Marshall, TX 75670.

n.    William C. O'Malley ("O'Malley"), Director, may be served at P.O. Box 61117, New Orleans, LA 70161-1117.

o.    James R. Peltier ("Peltier"), Director, may be served at 567 Highway 308, Thibodaux, LA 70301-7900.

p.    Robert T. Ratcliff ("Ratcliff"), Director, may be served at P.O. Box 7538, Alexandria, LA 71306-0538.

q.    Janee M. Tucker ("Tucker"), Director, may be served at 616 Girod St., New Orleans, LA 70130-3718.

r.    Virginia Eason Weinmann ("Weinmann"), Director, may be served at 601 Poydras St., Suite 2690, New Orleans, LA 70130-6026.

s.    Robert E. Zetzmann ("Zetzmann"), Director, may be served at P.O. Box 61540, New Orleans, LA 70161-1540.

## FACTUAL ALLEGATIONS

### THE MERGER AGREEMENT

7.    Hibernia and MarTex entered into an Amended and Restated Agreement and Plan of Merger dated January 19, 1999, to be effective as of June 29, 1998 (the "Merger Agreement").

8.     The Merger Agreement provided for, <u>inter alia</u>, the merger of MarTex with and into Hibernia and for the MarTex shareholders to receive a total of 3,450,000 shares of Hibernia common stock in exchange for all of the outstanding shares of MarTex common stock held by them.

## THE PROXY STATEMENT/PROSPECTUS

9.     In connection with the Merger, Hibernia prepared a Registration Statement on Form S-4 (the "Registration Statement") which included a Proxy Statement/Prospectus (the "Proxy Statement/Prospectus") which was disseminated to MarTex shareholders (including Plaintiffs). The Registration Statement was filed by Hibernia with the Securities and Exchange Commission (the "SEC") and became effective on February 2, 1999 (the "Effective Date").

10.     The Proxy Statement/Prospectus disclosed, among other things, the terms of the Merger Agreement, that a special meeting of MarTex shareholders would be held on March 5, 1999, at which time MarTex shareholders would be asked to vote upon the Merger, and that approval of the Merger required the affirmative vote of the holders of two-thirds of the total voting power represented by the outstanding shares of MarTex capital stock.

11.     The Proxy Statement/Prospectus contained a significant amount of information concerning Hibernia and its financial performance, including:

(i)     Selected Financial Information which sets forth, among other things, its per share income for the years ended December 31, 1993, 1994, 1995, 1996, and 1997, and for the nine months ended September 30, 1997 and 1998;

    (ii)     That the per share income was $.90 for the year ended December 31, 1997

and $.82 for the nine-month period ended September 30, 1998;

    (iii)    A historical and Pro Forma Combined Balance Sheet of Hibernia for

September 30, 1998; and

    (iv)    historical and Pro Forma Combined Statements of Income of Hibernia for

the nine months ended September 30, 1998.

The Proxy Statement/Prospectus incorporated by reference, and the above balance sheet and

statements of income, were based upon certain Quarterly Reports on Form 10-Q and Annual

Reports on Form 10-K, and in particular, the Quarterly Report for September 30, 1988, and the

Annual Report for the year ended December 31, 1997.

<u>LOAN LOSS RESERVES</u>

    12.    The Form 10-Q for the quarter ended September 30, 1998, and the Form 10-K for

the year 1997, both of which were incorporated by reference in the Proxy Statement/Prospectus,

set forth an explanation of how reserves for loan losses are determined. Specifically, the

language in the Form 10-K for the year ended 1997 provides in part as follows:

> "The provision for possible loan losses (a component of earnings) is the means by which the reserves for possible loan losses is adjusted to establish a reserve level considered adequate by management to absorb future potential loan losses.

> "The Board of Directors reviews the adequacy of the reserve each quarter. As a result of the low level of nonperforming loans and strong reserve coverage of nonperforming loans, Hibernia recorded no provision in 1997 . . .

> ". . . Even though the reserve for possible loan losses has declined over the last five years in total as a percentage of the loans, <u>the present level is considered adequate to absorb future potential loan losses.</u> [Emphasis added]

"During 1998, the Company expects to begin recording a provision for possible loan losses to maintain an adequate reserve level. Factors such as loan growth, the future collectability of loans and the amount and timing of future cash flows expected to be received on impaired loans will be considered and will impact the estimate of the required provision."

13.    Further, the language in the Form 10-Q for the nine-month period ended

September 30, 1998 provides in part:

"Asset quality remained strong with nonperforming assets as a percentage of total loans plus foreclosed assets and excess bank-owned property of .41% at September 30, 1998, unchanged from September 30, 1997. . . .

"The present level of reserve for possible loan losses is considered to be adequate to absorb future potential loan losses inherent in the existing portfolio considering the level and mix of the loan portfolio, current economic conditions and market trends."

14.    The historical Balance Sheet of Hibernia as of September 30, 1998, showed a loan

loss reserve of $127,000,000, and the historical Income Statement of Hibernia for the nine-month

period ended September 30, 1998, set forth a loan loss provision of $17,000,000.

15.    The Proxy Statement/Prospectus which was part of the Registration Statement did

not state anything with regard to additional loan loss provisions that would be necessary during

the first quarter of 1999, nor did the Proxy Statement/Prospectus disclose the actual default or

significant likelihood of defaults on major credit transactions in which Hibernia was the lender,

nor did the Proxy Statement/Prospectus disclose the effect of the defaults on the financial

condition and prospects of Hibernia, nor did the Proxy Statement/Prospectus disclose the

substantial increase in nonperforming assets of Hibernia as of December 31, 1998, or the

expected increases in quarterly loss provisions for the first quarter of 1999.

16.     The Form 10-K filed by Hibernia with the SEC on March 17, 1999, which contains financial information of Hibernia as of December 31, 1998, disclosed that nonperforming assets increased by $24.9 million, representing a 90% increase, from the prior year. Further, the Form 10-K stated that Hibernia expected the quarterly provision for possible loan losses to increase to maintain an adequate reserve level. Those material facts were not disclosed to Plaintiffs in the Proxy Statement/Prospectus, the Registration Statement, the Certificate referred to in ¶¶ 19 and 20 below or otherwise, and the failure to disclose such facts constitutes the omission of material facts.

## MARTEX APPROVAL OF THE MERGER

17.     The Proxy Statement/Prospectus also reported that MarTex's Board of Directors approved the Merger Agreement, and recommended its approval by shareholders based upon, inter alia, information provided to them concerning the financial performance, financial condition, business operations and prospects of Hibernia, the exchange ratio, and the belief of MarTex's Board that the exchange ratio was fair and in the best interests of MarTex shareholders.

18.     On March 5, 1998, MarTex shareholders voted to approve the Merger; the Merger was consummated on March 8, 1999; and pursuant to the Merger Agreement, MarTex Shareholders received shares of Hibernia stock in exchange for their MarTex stock.

## HIBERNIA'S OFFICERS' CERTIFICATE

19.     At the closing of the Merger on March 8, 1999 (the "Closing"), MarTex was provided an Officers' Certificate (the "Certificate") signed by Stephen A. Hansel, Hibernia's

\9751\532                              -10-

President and Chief Executive Officer, and by Marsha M. Gassan, Hibernia's Senior Executive Vice President and Chief Financial Officer, which provided as follows:

"1.     The representations and warranties of the Company contained [in] the Amended and Restated Agreement and Plan of Merger dated as of January 19, 1999 to be effective as of June 29, 1998, by and between the Company, and MarTex Bancshares, Inc. (the "Agreement") are true and correct in all material respects as of the date hereof except to the extent they speak as of an earlier date or as otherwise contemplated by the Agreement; and

2.     The Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied pursuant to the Agreement at or prior to the date hereof.

3.     Since the date of the agreement there has not occurred any material adverse change as described in Section 8.7 of the Agreement."

20.     In relevant part, the representations and warranties of the Agreement referenced in the Certificate related to the requirement that all appropriate disclosures of material facts would be made and that there would be no untrue statement of a material fact or omission of a material fact required to be stated and that there had not been since March 31, 1998, any "event or condition of any character (whether actual, or to the knowledge of Hibernia . . ., threatened or contemplated) that had or can reasonably be anticipated to have, or that, if concluded or sustained adversely to Hibernia, would reasonably be anticipated to have, a material adverse effect on the financial condition, the results of operations, business or prospects of Hibernia . . . ."

21.     The Certificate was false and misleading and omitted material facts required to be stated or necessary to make other statements made not misleading.

MARCH 11, 1999 PRESS RELEASE

22.     On March 11, 1999, only three days after the March 8, 1999 Merger Closing, Hibernia issued a press release (the "March 11, 1999, Press Release") which revealed certain of

the false and misleading statements and omissions in the Certificate, the Proxy

Statement/Prospectus and the Registration Statement.

23.    The March 11, 1999, Press Release provided in relevant part as follows:

Hibernia Corporation (NYSE:HIB-news) today announced that first-quarter results will include merger-related expenses and an addition to its planned provision for possible loan losses.

Expenses associated with the March 8 closing of Hibernia's merger with MarTex Bancshares, Inc., are expected to total approximately $8 million. The transaction with MarTex, parent of First Service Bank, makes Hibernia No. 1 in Marshall, Texas, with a 38% deposit market share, anchoring an area in northeast Texas contiguous to the company's already-strong northwest Louisiana market.

"In 1998, we resumed loan loss provisions with a $26 million expense, and our 1999 plan calls for us to more than double that amount," said President and CEO Stephen A. Hansel. "Hibernia is committed to recognizing and resolving credit-related problems rapidly, even when it comes at the expense of short-term earnings. We strongly believe that one of the best ways for us to keep the confidence of our stakeholders over time is to maintain soundness in terms of reserve coverage of problem loans, reserves to total loans, the nonperforming asset ratio and the leverage ratio."

Hibernia planned a $12-million loan loss provision in the first quarter, to which it now expects to add $18 million, bringing the total first-quarter loan loss provision to $30 million. The increase is primarily related to one credit, which consists of unsecured loans to a large commercial customer which Hibernia has served with both lending and deposit services for more than 25 years and which recently filed for bankruptcy protection. Also affecting the provision is a loss on a loan made to a company that experienced internal fraud. That loan had been placed on nonaccrual status in the fourth quarter of 1998 and disposed of completely through sale and charge-off during the first quarter of this year, as planned.

Hibernia expects to report first-quarter earnings per share assuming dilution that are approximately $0.10 lower than the $0.28 consensus estimate by analysts. This reduction consists of approximately $0.03 per share for the merger-related costs and approximately $0.07 per share for the additional provision.

24.     The disclosure in the March 11, 1999, Press Release that Hibernia would make a $30 million loan loss provision during the first quarter of 1999 had and continues to have a significant adverse effect on the value and trading price of Hibernia stock which at the time of the Closing was trading in excess of $16.00 per share but which fell significantly after the announcement. The price decrease caused significant damages to Plaintiffs.

25.     According to the March 11, 1999 Press Release, earnings per share of Hibernia stock were expected to decrease by approximately $.10 per share during the first quarter of 1999, from an expected $.28 per share to $.18 per share. As a result, the price per share of Hibernia stock decreased significantly.

26.     Additionally, in the March 11, 1999 Press Release, Hibernia stated that $.03 of the anticipated per share loss of earnings was attributable to expenses incurred as a result of the Merger. Though Hibernia was fully aware of these expenses, and its Board of Directors could have acted upon this knowledge prior to the effective date of the Proxy Statement/Prospectus, it did not provide any disclosure in the Proxy Statement/Prospectus or otherwise relative to this impact upon earnings.

MARCH 11, 1999 FORM 8-K

27.     On March 11, 1999, the same date as the Press Release, Defendants filed with the SEC a Form 8-K (the "March 11, 1999, Form 8-K") which contained the same information as the March 11, 1999, Press Release. The facts disclosed in the March 11, 1999, Form 8-K were reflected as "Other Events" which are events that the issuer deems of importance to shareholders. These important events, which existed on the date of the MarTex shareholder meeting to

\9751\532                            -13-

consider the Merger and on the date of the Closing of the Merger, were not disclosed to Plaintiffs.

## OTHER LOANS

28.     Plaintiffs believe there were other loans made by Hibernia for which Hibernia had not adequately recognized and reserved for losses. The failure to properly recognize and provide for losses resulted in material misstatements and omissions with regard to Hibernia's financial condition as reflected in the Registration Statement. Hibernia's Form 10-K for calendar year 1998, which was filed shortly after the Closing, disclosed a 90% increase in nonperforming assets. This disclosure represented a significant change from the statements made in Hibernia's Form 10-Q for September 30, 1998 (which was incorporated by reference into the Registration Statement and Proxy Statement/Prospectus) that asset quality remained strong. Hibernia failed to provide this information to Plaintiffs in connection with the Merger.

## DEFENDANTS' KNOWLEDGE OF THE PRECARIOUS FINANCIAL CONDITION OF UNITED COMPANIES FINANCIAL CORPORATION

29.     Based on information and belief, the large commercial customer referred to in the March 11, 1999, Press Release was United Companies Financial Corporation ("United') with which Hibernia had a long-term relationship of approximately 25 years. Based on information and belief, Hibernia was well aware of the precarious financial condition of United. Hibernia did not disclose this precarious position in the Proxy Statement/Prospectus, or in the Certificate, or otherwise, and did not change any financial numbers in the Proxy Statement/Prospectus to reflect the corresponding need for any increase in the loan loss reserve. Based on information and belief, Defendants knew of, or but for their reckless disregard for the truth would have known of, the precarious financial condition of United as of the effective date of the Registration

\9751\532                                          -14-

Statement, as of the date of the MarTex shareholders meeting to vote on the Merger and as of the closing date of the Merger.

30.     A number of significant factors clearly made United's financial condition known to Hibernia prior to the Effective Date and well in advance of the Closing, including the following:

(i)     J. Terrell Brown, United's CEO, was a director on Hibernia's Board until October of 1998, and was chairman of the credit committee until October 1998. The credit committee's functions include review and approval of the policy and methodology for the Reserve for Possible Loan Losses;

(ii)    On July 22, 1998, United publicly announced a precipitous decline in earnings;

(iii)   On October 26, 1998, United publicly announced a major restructuring plan which as to its unsecured credit (of which Hibernia owned a part), was subject to approval of participating banks (including Hibernia);

(iv)    Hibernia's Form 10-K for calendar year 1998 disclosed a 90% increase in nonperforming assets of which 50% was attributable to one credit. Plaintiffs believe the credit was with United.

(v)     On February 3, 1999, United publicly announced that it was not in compliance with the loan documents and that no agreement had been reached on the restructuring of the unsecured debt; and

(vi)    On March 1, 1999, United filed bankruptcy under Chapter 11 of the Bankruptcy Code.

31.     Because Hibernia's share of the unsecured credit of United was significant (over $30,000,000), it clearly was keeping track of the status of the credit and would have known of the material possibility of the loan default and the bankruptcy long before either the Effective Date or the Closing.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

32.     For the reasons set out in Paragraphs 17 through 31, the information contained in the Certificate, Proxy Statement/Prospectus, and Registration Statement with respect to the financial condition and prospects was materially false and misleading and omitted material facts required to be stated or necessary to make other statements made not misleading.

33.     MarTex shareholders, on the basis of the materially false and misleading Hibernia financial information, approved the Merger Agreement. The Merger Agreement included various conditions to closing, one of which was the delivery of a Certificate of the Chief Executive Officer and Chief Financial Officer certifying that no material adverse change had occurred in the financial condition of Hibernia. Defendants Hansel and Gassan signed and delivered to MarTex such a Certificate on March 8, 1999. Had the facts been known to Plaintiffs, the Merger Agreement would not have received the required vote for approval. Had the Certificate accurately disclosed the facts, the Merger would not have been consummated.

34.     Defendants knew, at the time they provided the Certificate, Proxy Statement/Prospectus, and Registration Statement that such documents contained materially false and misleading statements and omitted material facts.

35.     Plaintiffs, in the exercise of due diligence, could not have learned of the facts, but instead relied to their detriment on the false information contained in the Proxy Statement/Prospectus and Certificate when making their investment decision and/or casting their votes.

36.     Plaintiffs acquired Hibernia common stock relying upon the false and misleading statements and without knowledge of the material, adverse, undisclosed information and false

financial statements which were known to Defendants, and Plaintiffs have been damaged as a result.

## Count I

## VIOLATION OF SECTION 11 OF THE SECURITIES ACT

37.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1 through 36 above as if fully set forth herein, except allegations of fraud or fraudulent intent.

38.   This separate and distinct claim for relief against all Defendants is brought pursuant to Section 11 of the Securities Act and is based upon a statutory violation of the Securities Act. This Section 11 claim is not based on fraud.

39.   Defendant Hibernia was the issuer of the Registration Statement which included the Proxy Statement/Prospectus. The Individual Defendants were signatories of the Registration Statement or Directors of Hibernia.

40.   The Defendants issued, caused to be issued, and participated in the issuance of the Registration Statement which was inaccurate and misleading, contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein not misleading at the time such Registration Statement became effective. The Registration Statement failed to properly disclose Hibernia's financial operations for the nine months ended September 30, 1998, failed to properly disclose the pro forma financial statements for the combination of Hibernia and MarTex for the period ended September 30, 1998, failed to disclose the increase in the loan loss reserve for the first quarter of 1999, failed to state the facts which necessitated such increase in the loan loss reserve, and failed to state the significant increase in nonperforming assets of Hibernia as of December 31, 1998. As a direct and proximate result of

\9751\532

Defendants' wrongful conduct, the market price of Hibernia securities was artificially inflated at the time of the transaction and Plaintiffs suffered damages in connection with their purchase of Hibernia stock as a result of the misstatements and omissions in the Registration Statement.

41.     The inaccuracy of the information contained in the Registration Statement and the failure to disclose other matters in the Registration Statement would have been material to a reasonable investor as having significantly altered the total mix of information available regarding the purchase of such securities.

42.     All Individual Defendants failed to make a reasonable investigation into the matters contained within the Registration Statement and/or had no reasonable ground to believe that the Registration Statement was true.

43.     Plaintiffs acquired their securities without the knowledge of the falsity, untruths and omissions alleged herein.  Plaintiffs were damaged by Defendants' misconduct and by the material misstatements in the Registration Statement.

44.     Plaintiffs became aware of the material misrepresentations and omissions as a result of the March 11, 1999, Press Release and the 10-K for the 1998 calendar year.  Thus, this action was brought within one year after the discovery of the misstatements and omissions, and within one year after discovery should have been made in the exercise of reasonable diligence, and within three years after the securities were offered to the public.

45.     By virtue of the foregoing, Defendants violated Section 11 of the Securities Act and Plaintiffs suffered damages.

**Count II**

## VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT

46.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1 through 36 of the Complaint as if set forth fully herein, except allegations of fraud or fraudulent intent.

47.     This separate and distinct claim for relief against Defendant Hibernia is brought pursuant to Section 12(a)(2) of the Securities Act.  All individual Defendants are liable under Section 15 of the Securities Act as control persons.  This Section 12(a)(2) claim is not based on fraud.

48.     Defendant Hibernia offered and sold securities by the means of interstate commerce and the mails, pursuant to the Proxy Statement/Prospectus which contained untrue statements of material fact and omitted material information regarding the financial condition of Hibernia.

49.     The material omissions and falsities contained in the Proxy Statement/Prospectus included the failure of Hibernia to properly disclose Hibernia's financial operations for the nine months ended September 30, 1998, the failure to properly disclose the pro forma financial statements for the combination of Hibernia and MarTex for the period ended September 30, 1998, the failure to disclose the increase in the loan loss reserves for the first quarter of 1999, the failure to state facts which necessitated such increase in the loan loss reserve, the failure to state the significant increase in nonperforming assets as of December 31, 1998, and the failure to disclose that Hibernia had issued loans as an unsecured creditor to a borrower which had a precarious financial position that included pending bankruptcy.  These omissions and falsities

were material in that Plaintiffs would have considered them significant in deciding whether to purchase the securities.

50.     Plaintiffs had no knowledge of the falsities and omissions contained in the Proxy Statement/Prospectus.  Plaintiffs were not aware that United was facing financial difficulties that would lead to bankruptcy and thereby adversely affect the value of Hibernia's stock.  Nor were Plaintiffs aware that Hibernia had failed to provide a loan loss amount sufficient to cover default by United and other borrowers.

51.     Defendant Hibernia knew of, or in exercise of reasonable care could have learned of, the falsities and omissions in the Proxy Statement/Prospectus for the reasons including, but not limited to, those set forth in ¶¶ 29 through 31.

52.     Defendant Hibernia's misrepresentations, falsities and omissions as contained in the Proxy Statement/Prospectus were the direct and proximate cause of the decrease in value of the Hibernia shares and thus, the damages suffered by Plaintiffs.

53.     Plaintiffs became aware of the material misrepresentations, falsities and omissions as a result of Defendant Hibernia's March 11, 1999 Press Release.  Plaintiffs therefore bring this action within one year after discovery of the untrue statements and omissions and within three years of the sale of the securities.

54.     Plaintiffs hereby tender their shares to Defendants.

## Count III

### VIOLATION OF SECTION 10(b) AND RULE 10b-5 OF THE EXCHANGE ACT

55.     Plaintiffs herein repeat and reallege each and every allegation contained in ¶¶ 1 through 36, as if fully set forth herein.

\9751\532                                    -20-

56.     This separate and distinct claim for relief is brought against Defendants pursuant to section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.     Each of the Defendants:  (1) knew or had access to the material adverse information about (a) the precarious financial condition of United and other borrowers from Hibernia, (b) the need for an increase in the loan loss reserve of Hibernia, (c) the anticipated per share loss of earnings of $.03 as a result of expenses related to the Merger, and (d) the significant increase in nonperforming assets of Hibernia; and (2) participated in drafting, reviewing or approving misleading statements, releases, reports and other representations discussed herein.

58.     With knowledge of or severe reckless disregard for the truth, Defendants disseminated or approved the false and misleading statements specified in ¶ 32, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  These statements are contained in the Certificate and the Proxy Statement/Prospectus which failed to disclose the information about the precarious financial condition of United and certain other borrowers from Hibernia, the need for an increase in the loan loss reserve, and the anticipated per share loss of earnings of $.03 as a result of expenses related to the merger.  Defendants' knowledge or severe reckless disregard for the truth is shown by the facts alleged in ¶¶ 29 through 31, which are restated herein.

59.     Based on information and belief, the large commercial customer referred to in the March 11, 1999, Press Release was United Companies Financial Corporation ("United") with which Hibernia had a long-term relationship of approximately 25 years.  Based on information and belief, Hibernia was well aware of the precarious financial condition of United.  Hibernia did

\9751\532                                    -21-

not disclose this precarious position in the Proxy Statement/Prospectus, or in the Certificate or otherwise and did not change any financial numbers in the Proxy Statement Prospectus to reflect the corresponding need for any increase in the loan loss reserve based on information and belief. Defendants knew of or were reckless in failing to discover the precarious financial condition of United as of the effective date of the Registration Statement, as of the date of the MarTex shareholders meeting to vote on the Merger and as of the closing date of the Merger.

60.   A number of significant factors clearly made United's financial condition known to Hibernia prior to the Effective Date and well in advance of the Closing, including the following:

(i)   J. Terrell Brown, United's CEO, was a director on Hibernia's Board until October of 1998, and was chairman of the credit committee until October 1998. The credit committee's functions include review and approval of the policy and methodology for the Reserve for Possible Loan Losses;

(ii)   On July 22, 1998, United publicly announced a precipitous decline in earnings;

(iii)   On October 26, 1998, United publicly announced a major restructuring plan which as to its unsecured credit (of which Hibernia owned a part), was subject to approval of participating banks (including Hibernia);

(iv)   Hibernia's For 10-K for the calendar year 1998 disclosed a 90% increase in nonperforming assets of which 50% was attributable to one credit. Plaintiffs believe the credit was with United;

(v)   On February 3, 1999, United publicly announced that it was not in compliance with the loan documents and that no agreement had been reached on the restructuring of the unsecured debt; and

(vi)   On March 1, 1999, United filed bankruptcy under Chapter 11 of the Bankruptcy Code.

61.   Because Hibernia's share of the unsecured credit of United was significant (over $30,000,000), it clearly was keeping track of the status of the credit and would have known of the

\9751\532

material possibility of the loan default and the bankruptcy long before either the Effective Date or the Closing.

62.    Not only did Defendants have knowledge of United's financial condition, but also had knowledge of the financial condition of other borrowers of Hibernia. Defendants Boydstun, Campbell, Freeman, Nalty, Nesbitt, Ratcliff, Tucker and Peltier were members of the Credit Committe of Defendant Hibernia. The Credit Committee's responsibilities include review and approval of the policy and methodology for the Reserve for Possible Loan Losses and certain aspects of Hibernia's strategic plans. The other members of the Board, other Individual Defendants, are required to approve these policies and methodologies relating to Loan Loss Reserves and are responsible for the activities delegated to the Credit Committee.

63.    Defendants have violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements or material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs.

64.    Plaintiffs relied on the integrity of the market and directly relied on the misleading and false statements contained in the Certificate and Proxy Statement/Prospectus. Plaintiffs would not have agreed to and voted in favor of the Merger or would not have acquired the shares of Hibernia common stock if they had been aware that Defendants' statements were false and misleading and had they been aware of the truth, including, without limitation, the matters disclosed in the March 11, 1999 Press Release and in the 8-K.

\9751\532

65.     Not until the March 11, 1999 Press Release and 8-K did Defendants disclose the information that put Plaintiffs on notice of the misstatements and omissions.  This action is being filed within one year after such discovery should have been made in the exercise of reasonable diligence and within three years of the transaction.

## Count IV

## COMMON LAW FRAUD

66.     Plaintiffs herein repeat and reallege each and every allegation contained in ¶¶ 1 through 65, as if fully set forth herein.

67.     On or about March 8, 1999, in order to induce MarTex and Plaintiffs to consummate the Merger, Defendant Hibernia, through its agents Defendant Hansel (President and Chief Executive Officer of Hibernia Corporation) and Defendant Gassan (Senior Executive Vice President and Chief Financial Officer of Hibernia Corporation), knowingly made false representations as to material facts to Plaintiffs with the intent of inducing Plaintiffs to exchange their MarTex shares for Hibernia shares.

68.     Defendants Hibernia, Hansel and Gassan knowingly made the following representation in the Certificate delivered to MarTex as a condition to closing of the Merger: "Since the date of the agreement there has not occurred any material adverse change as described in Section 8.7 of the Agreement."  The effective date of the Merger Agreement was June 29, 1998.  Section 8.7 of the Merger Agreement states:

> Since March 31, 1998, there has been no event or condition of any character (whether actual, or to the knowledge of Hibernia or HNB, threatened or contemplated) that has had or can reasonably be anticipated to have, a material adverse effect on the financial condition, results of operation, business or prospects of Hibernia or HNB, excluding changes in laws or regulations that affect banking institutions generally.

\9751\532                                    -24-

Plaintiffs voted in favor of the Merger Agreement which included conditions to closing, one of which was that the Chief Executive Officer and Chief Financial Officer of Hibernia deliver a certificate that all representations and warranties contained in the Merger Agreement were true and correct as of the closing date of the Merger. Defendants Hansel and Gassan delivered the required Certificate with the representation referenced above. Seven days prior to delivery of the Certificate, on March 1, 1998, United filed bankruptcy. Three days after delivery of the Certificate, on March 11, 1998, Hibernia announced an addition to its loan loss reserve of $18 million due primarily to the loan to United. Defendants Hibernia, Hansel and Gassan had to know at the time of the Merger of the facts that were included in the March 11 Press Release. In addition, the Form 10-K filed by Hibernia on March 17, 1999, for the 1998 calendar year disclosed a 90% increase in nonperforming assets and an expectation that quarterly provisions for loan losses would increase to maintain adequate reserve levels. Defendants Hibernia, Hansel and Gassan had to know of the facts revealed in the Form 10-K at the time of the MarTex stockholder meeting to consider the Merger, at the time of the Effective Date of the Registration Statement, at the time of the execution of the Certificate and at the time of the Closing,

69.     Plaintiffs further allege that the representation set forth in the preceding paragraph concerned material facts for the reason that Plaintiffs would not have exchanged their MarTex stock for the Hibernia stock had the Certificate or Proxy Statement/Prospectus accurately disclosed the facts which were disclosed only three days later in the March 11, 1998 Press Release and 8-K. The representation was relied on by Plaintiffs to Plaintiffs' substantial injury and damage. In this connection, Plaintiffs further allege that Defendants purported to have and

did have superior knowledge concerning the subject matter of the transaction described above, and Plaintiffs justifiably relied upon Defendants' superior knowledge.

70.     By reason of Plaintiffs' reliance upon Defendants' representations described above, Plaintiffs have been damaged in an amount far in excess of the minimum jurisdictional limits of this Court.

71.     Plaintiffs further allege that by reason of the fact that Defendants knew the representations described above were false at the time they were made, the representations were willful and malicious and constitute conduct for which the law allows the imposition of exemplary damages.  In this connection, Plaintiffs will show that they have incurred significant expenses, including attorneys' fees, in the investigation and prosecution of this action.

### Count V

### STATUTORY FRAUD UNDER SECTION 27.01
### OF THE TEXAS BUSINESS AND COMMERCE CODE

72.     Plaintiffs herein repeat and reallege each and every allegation contained in ¶¶ 1 through 71, as if fully set forth herein.

73.     The statement by Defendants referred to in ¶ 68 was false.

74.     When the Defendants made the statement referred to in ¶ 68, Defendants either knew that it was false or made it recklessly without any knowledge of the truth, and made it as a positive assertion.

75.     Defendants made the statement referred to in ¶ 68 with the intent of inducing Plaintiffs to consummate the Merger.

76.     Relying on Defendants' statements referred to in ¶ 68, Plaintiffs consummated the Merger.  Plaintiffs would not have consummated the Merger but for Defendants' statements.

\9751\532                              -26-

77.     Because Plaintiffs relied on Defendants' representations, Plaintiffs have been damaged in the sum far in excess of the jurisdictional limits of this Court.

78.     Defendant made the false representation referred to in ¶ 68 with actual awareness of its falsity.

## Count VI

## VIOLATION OF SECTION 33 OF THE TEXAS SECURITIES ACT

79.     Plaintiffs herein repeat and reallege each and every allegation contained in ¶¶ 1 through 78, as if fully set forth herein.

80.     On March 8, 1999, the Merger contemplated by the Merger Agreement was consummated.  As a result, Plaintiffs' shares in MarTex were exchanged for stock in Hibernia. This stock is a security within the meaning of the terms of Article 581-4(A) of the Texas Revised Civil Statutes.

81.     The representation referred to in ¶ 68 was untrue at the time it was made, and in fact there had been several events which had occurred between March 31, 1998, and March 8, 1999, which did have a material adverse effect on the financial condition of Hibernia and HNB.

82.     Plaintiffs further allege that the representation set forth in ¶ 68 concerns material facts for the reason that Plaintiffs would not have agreed to the exchange of their MarTex stock for Hibernia stock if they had been aware of the falsity of that representation.

83.     Defendant Hansel, with intent to deceive or defraud or with reckless disregard for the truth, directly and indirectly aided Defendant Hibernia, and is thereby liable jointly and severally with Defendant Hibernia.

\9751\532

-27-

84.     Defendant Gassan, with intent to deceive or defraud or with reckless disregard for the truth, directly and indirectly aided Defendant Hibernia, and is thereby liable jointly and severally with Defendant Hibernia.

85.     Plaintiffs thereby suffered injury far in excess of the jurisdictional limits of this Court.

86.     Defendant Hibernia, through its agents Defendant Hansel and Defendant Gassan, willfully made the false representation referred to in ¶ 68 for the purpose of injuring Plaintiffs. Such conduct of Defendants was intentional, willful, wanton and malicious, thereby justifying the imposition of exemplary damages.

87.     Plaintiffs would show that they have been required to employ the services of the undersigned attorneys to bring this action.

## JURY DEMAND

Plaintiffs demand a jury trial of all factual issues in this cause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through their undersigned attorneys, request that the Court grant the following relief:

A.     a judgment in favor of Plaintiffs against each of the Defendants named herein for damages resulting from their violations of the federal securities laws alleged herein;

B.     a judgment for damages in favor of Plaintiffs against Defendants Hibernia, Hansel and Gassan for common law fraud, statutory fraud and violations of the Texas Securities Act;

C.     an award of recission to the extent that Plaintiffs still hold Hibernia shares and rescissory damages to the extent they do not;

D.   an award to Plaintiffs for compensatory damages against all Defendants;

E.   prejudgment and post-judgment interest as allowed by law;

F.   exemplary damages;

G.   an order awarding Plaintiffs attorneys' fees, together with costs incurred in the prosecution of this action, including the cost of expert consultants necessary for the proper prosecution of this case; and

H.   such other relief as this Court deems just and proper.

Date: September _16th_, 1999.

Respectfully submitted,

_Ted Bostwick_

Frederick deB. Bostwick II.
Attorney-In-Charge
Texas Bar No. 02682500
Michael L. Scanes
Texas Bar No. 17701000
of
NAMAN, HOWELL, SMITH & LEE, P. C.
900 Washington, 7th Floor
P. O. Box 1470
Waco, Texas  76703-1470
(254) 755-4100
FAX (254) 754-6331

ATTORNEYS FOR PLAINTIFFS

\9751\532                              -30-

Robert Watson
Texas Bar No. 20961200
Law, Snakard & Gambill
500 Throckmorton, Suite 3200
Fort Worth, Texas 76102
(817) 335-7373
FAX (817) 332-7473

OF COUNSEL FOR PLAINTIFFS